FOR PUBLICATION

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-13776

_____

UNITED STATES OF AMERICA,

                                                                            *Plaintiff-Appellee*,

versus

MICHAEL PRIME,

                                                                         *Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cr-00540-JSM-AAS-1

_____

Before JILL PRYOR, GRANT, and MARCUS, Circuit Judges.

GRANT, Circuit Judge:

     Michael Prime was arrested in 2019 for counterfeiting and identity theft after police found piles of evidence connected to his crimes: fake credit cards, fake driver's licenses, laptops, and the like.

Over four years later, he requested the return of an orange external hard drive that was seized, claiming that it contained the cryptographic keys necessary to access close to 3,443 bitcoin—now worth over $345 million.

The problem? At least three times before— in his financial disclosure statement, in his interview with the probation office, and at his sentencing hearing—Prime had represented that he owned very little bitcoin. And the government had relied on these representations, abandoning its search for the bitcoin. Prime's story remained the same when he went to recover his devices after he got out of prison: he never told the government one of the hard drives contained valuable bitcoin. And the government, consistent with its ordinary practices and after giving notice to Prime, wiped what devices it could. The rest, including the hard drive in question here, were destroyed. For years, Prime denied that he had much bitcoin at all. And bitcoin was not on the list when he sought to recover missing assets after his release from prison. Only later did Prime claim to be a bitcoin tycoon.

By then it was too late. Whether it contained bitcoin or not, the hard drive had been destroyed by the government. Prime now claims that the United States, because it destroyed the hard drive containing his bitcoin key, owes him roughly $345 million in bitcoin. The district court, citing Prime's delays and denials,

23-13776               Opinion of the Court                      3

concluded that laches barred his bitcoin request. We agree and affirm.[1]

## I.

Responding to a domestic dispute, deputies from the Hillsborough County Sheriff's Office found Michael Prime on the roof of his house holding a loaded 9mm handgun. He told them his name was "Johnathan Strong" and offered up a counterfeit Washington driver's license bearing that name. But after entering the home with consent from Prime's wife, deputies saw "stacks of credit cards, an embosser, and other items used to make counterfeit credit cards." And a search of the house unearthed still more evidence:

- 1,744 counterfeit credit and debit cards;

- 1,490 blank cards of varying color, some containing magnetic stripes and debit card chips;

- 37 counterfeit driver's licenses and IDs;

- counterfeit social security card templates;

- paper containing embedded blue and red fibers similar to U.S. currency paper;

- laptops, tablets, hard drives, and electronic media storage devices; and

---

[1] We deny the government's motion for summary affirmance as moot.

- card printers, a laminator, a credit card cutter, and a laser engraver.

The electronic devices, in turn, housed nearly 300 credit and debit card numbers, images of driver's licenses and social security cards, and more. These devices also revealed dark-web sales of credit cards and IDs. Plus guns—"unregistered, new, and untraceable," as Prime's online listings put it.

After his arrest, Prime admitted to choking his wife, making counterfeit credit cards and IDs, and building Glock-style firearms from parts he purchased online. He admitted that he sold the counterfeit items online and accepted Bitcoin currency as payment. He also explained that he was paid $1,000 per month in bitcoin to work for a website that sold stolen credit card information. His total bitcoin holdings, he said, had been approximately 3,500 bitcoin, which he had used to pay for assets, including vehicles and boats.

Federal agents then obtained warrants authorizing the seizure of Prime's cryptocurrency, but their attempts were fruitless. After his first two tries, one agent reported in October 2018, that "no cryptocurrency, private keys or recovery seeds" were found and that "no contents were located or seized from any Coinbase account." A third attempt in February 2019 fared no better—agents were "unable to gain access" to any "cryptocurrency wallet."

Given the overwhelming evidence implicating Prime, it is unsurprising that he pleaded guilty to access device fraud,

aggravated identity theft, and illegal possession of a firearm. And as part of his November 2019 plea agreement, he agreed to "make a full and complete disclosure of all assets over which [he] exercise[d] control directly or indirectly." His plea repeated his previous claim to "approximately 3,500 Bitcoin."

But after the plea, Prime changed his tune—he no longer claimed to own a significant amount of cryptocurrency. In February 2020, as part of an asset investigation, Prime submitted a financial disclosure reporting ownership of only $200 to $1,500 in bitcoin. And less than two weeks later, he told the probation office that $1,500 in the cryptocurrency—amounting to a small fraction of a single bitcoin—was "his only remaining asset."

Prime's June 2020 sentencing hearing brought more of the same. In response to the government's statement that it could not locate any bitcoin, his counsel conceded that Prime's original estimation of his bitcoin holdings was "not supported by the evidence." And after acknowledging that the government had a year and a half to "find some great amount of bitcoin," his attorney admitted that, "frankly, at this juncture [the bitcoin] doesn't exist other than what [Prime] had from his mining days in Seattle back almost ten years ago, a lot of which was used to purchase the assets that were seized by the Government in this case."

The district court sentenced Prime to sixty-five months' imprisonment. He served about two years in prison before he was transferred to a halfway house in July of 2022. Around that time, the Secret Service sent three letters to Prime, telling him that

certain electronic devices could be wiped and returned to him if he responded within thirty days with his passwords. Prime responded and asked for a pick-up time. But the devices never changed hands—three days before he was set to meet with the Secret Service, Prime filed suit instead.

Prime's motion, framed as a request for counsel and denied by the district court, mentioned "boats and cars"—but not bitcoin or a hard drive. Eventually, Prime secured private counsel and filed another motion, this time seeking the return of an external hard drive that he said contained nearly 3,443 bitcoin. Fed. R. Crim. P. 41(g). The district court denied this motion too, concluding that the property had been "properly destroyed," that Prime was "not entitled to anything back," and that laches barred his claim. This is his appeal.

## II.

When a district court denies a Rule 41(g) motion, we apply three standards of review. We review conclusions of law de novo, factual findings for clear error, and the "balancing of the equities" for abuse of discretion. *United States v. Howell*, 425 F.3d 971, 973 (11th Cir. 2005); *United States v. De La Mata*, 535 F.3d 1267, 1279 (11th Cir. 2008).

## III.

When a litigant seeking the return of property "invokes Rule 41(g) after the close of all criminal proceedings, the court treats the motion for return of property as a civil action in equity." *Howell*, 425 F.3d at 974. In ruling on that motion, the district court

23-13776               Opinion of the Court                    7

considers "all the equitable considerations in order to make a fair and just decision." *Id.* And even if the property has been "lost or destroyed," the district court retains the "authority to fashion an equitable remedy." *United States v. Potes Ramirez*, 260 F.3d 1310, 1315 (11th Cir. 2001).

Here, the government raised laches, an "equitable doctrine by which a court denies relief to a claimant who has unreasonably delayed in asserting the claim." *Laches*, Black's Law Dictionary (12th ed. 2024); *see also* Restatement (First) of Restitution § 148(1) (A.L.I. 1937). To establish laches, the government must show (1) "a delay in asserting a right or a claim," (2) that "the delay was not excusable," and (3) that it caused the government "undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005). Check, check, check.

*First*, Prime failed to assert his claim to the bitcoin for more than three years. In fact, he repeatedly denied it. Although Prime's 2019 plea agreement recounted his earlier claim that he owned 3,500 bitcoin, his post-plea statements were worlds apart from that assertion. Start with his February 2020 financial disclosure. At that time, he reported owning only $200 to $1,500 in bitcoin. Next came his interview with the probation office, where he said that "his only remaining asset" was $1,500 in bitcoin.

Prime tries to explain away these representations. He now claims that he never specified the amount of bitcoin that he owned in his financial disclosure, instead simply reporting that the market value of a single bitcoin at that time was between $200 and $1,500.

We don't buy it.  For one thing, that valuation is preposterous—the value of a single bitcoin in February 2020 fluctuated between about $8,500 and $10,500.  For another, Prime promised in his plea agreement that his financial statement and disclosures would be "complete, accurate and truthful" and would include "all assets" in which he had *any interest* or over which he exercised "control, directly or indirectly" (emphasis added).  In other words, he needed to disclose the amount of bitcoin he owned—not estimate (incorrectly) the contemporaneous value of a single bitcoin.

Also, Prime says that he only reported $1,500 in bitcoin during his interview with the probation office because he did not have it in his possession at that time.  That's why, he says, he did not report his boats and other seized property as assets either.  But that explanation is inconsistent with the plea agreement's requirement that he report all assets in which he had *any interest* (emphasis added).  And Prime's other statements in that interview show that he understood the requirement.  He told the probation office that the "two boats and two vehicles" the government had seized "represented the majority of his assets"—something that could not have been true if he also owned bitcoin worth tens of millions of dollars.  So he counted those assets even though they were not in his possession at the time.

And we are only halfway through Prime's inconsistent post-plea representations.  Consider two more.  At sentencing, Prime's attorney acknowledged that his original claim to "some great amount of bitcoin" was "not supported by the evidence."  In fact,

23-13776               Opinion of the Court                    9

he admitted that the bitcoin was largely nonexistent, "other than what [Prime] had from his mining days in Seattle back almost ten years ago, a lot of which was used to purchase the assets that were seized by the Government in this case." And in August 2022, when Prime asked the court to appoint counsel to help him request the return of seized items, the motion mentioned boats and cars—but not bitcoin or an orange external hard drive. He would not file his Rule 41(g) motion requesting the return of those items until more than a year later.

All that to say, Prime waited more than three years after his plea to raise any claim at all about the bitcoin he now says was on his hard drive. And in the meantime, he and his attorney repeatedly disclaimed its existence. That is textbook delay; the first laches prong is satisfied.

*Second*, the delay was not excusable. Prime offers no justification for his repeated assertions that he owned very little bitcoin. Instead, he says the roughly fourteen months between his back-and-forth with Secret Service agents in the summer of 2022 and his Rule 41(g) filing should not count as delay because at that time he was separately communicating with the government about the return of his bitcoin. But even if those alleged communications could have mitigated his filing requirements (which they could not), this time period accounts for less than half of Prime's delay. And in any event, the only evidence in the record of his negotiations with the government does not mention bitcoin or the orange external hard drive. The same is true for the August

10                  Opinion of the Court                  23-13776

2022 motion to appoint counsel—no reference to bitcoin. Put simply, there was no excuse (or even explanation) for Prime's delay.

*Third*, and finally, the delay prejudiced the government. Early in the process, the government executed three warrants, but those searches came up empty. Later, the hard drive allegedly containing the bitcoin was destroyed, along with other electronic evidence, because Prime would not cooperate with the government to remove "contraband evidence" contained on his devices.[2]

We have little difficulty concluding that the government would not have destroyed the hard drive if it had thought that it contained millions of dollars in bitcoin. But now that the hard drive is destroyed, the government cannot return it. To the extent that the bitcoin ever existed (and we have our doubts), the government would now have to find and hand over almost 3,443 replacement bitcoin to make Prime whole.[3] That is prejudice in anyone's book—now to the tune of over $345 million.

---

[2] The district court found that the hard drive was "destroyed." On appeal, Prime complains that the government failed to provide evidence of that destruction. And without such evidence, he argues, the district court could not determine whether the bitcoin was destroyed. *See Potes Ramirez*, 260 F.3d at 1314. But Prime forfeited this argument by failing to raise it before the district court. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

[3] We need not and do not decide whether the bitcoin would have been subject to forfeiture if it existed.

The sum of it is this: Because Prime's inexcusable delay prejudiced the government, laches bars his claim.

★   ★   ★

Even if the bitcoin existed—and that's a big if—awarding Prime an equitable remedy here would be inequitable. His delay in claiming a right to the bitcoin and requesting its return bars his suit. We **AFFIRM** the district court's judgment.